No. 92-235

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

GLORIA J. WEAVER,

       Claimant and Appellant,

-vs-

BUTTREY FOOD AND DRUG,

       Employer/Insurer, Respondent
       and Cross-Appellant,

FILED

OCT 29 1992

Ed Smith
CLERK OF SUPREME COURT.
STATE OF MONTANA

APPEAL FROM:   The Workers' Compensation Court,
               The Honorable Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Richard J. Martin, Alexander, Baucus & Linnell,
          Great Falls, Montana

      For Respondent:

          G. Curtis Drake, Keller, Reynolds, Drake, Sternhagen
          & Johnson, Helena, Montana

Submitted on Briefs:  September 10, 1992

Decided:  October 29, 192

Filed:

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the Workers' Compensation Court, the Honorable Timothy W. Reardon presiding. Claimant Gloria Weaver (Weaver) appeals the Workers' Compensation Court judgment that she is not entitled to past and present temporary total disability benefits for certain injuries incurred during the course and scope of her employment at Buttrey Food and Drug. Respondent Buttrey Food and Drug (Buttrey) cross-appeals the Workers' Compensation Court judgment that Weaver's back condition is causally related to her work injury. We affirm.

Weaver was injured on June 15, 1986, while working as a checker at the Buttrey store in Cut Bank, Montana. At the time of the accident she was a 46-year old high school graduate and married with two dependent children. She had been working at the same Buttrey store for approximately twenty-one years.

The accident occurred when a customer pushed a cart piled high with large canned goods through Weaver's checkstand. When Weaver opened the front gate of the cart, the cans began to tumble out. To avoid being struck by a can, Weaver jumped backward and sideways with a twisting motion. As she did so, she felt a hot searing pain in her left thigh. She finished her shift, but by that time two large lumps had formed on her thigh. Her supervisor immediately took her to a doctor who diagnosed the injury as a hematoma and recommended elevation and ice packs.

Weaver continued to work at the Buttrey store until September 17, 1986. By then her leg was bothering her so much that she took

2

vacation and then, on the manager's recommendation, a leave of absence. Buttrey's insurer paid benefits for temporary total disability from September 17, 1986 until April 4, 1987. During this period Weaver consulted Dr. J. W. Bloemendaal, an orthopedic surgeon in Great Falls. Dr. Bloemendaal diagnosed a possible rupture of the facia around Weaver's left quadriceps and prescribed physical therapy and exercise to strengthen the muscle. On March 18, 1987, Dr. Bloemendaal wrote to a Workers' Compensation adjuster, stating that in his opinion Weaver could return to work. Buttrey already had terminated her employment, however, because the six-month disability leave allowed by her union contract had expired. Weaver never returned to the Buttrey store, which burned down in November 1987, though she did apply for work at the new store in 1988.

Weaver considered Dr. Bloemendaal's letter a "release," but she did not feel that she could return to work because her leg was weak and she still had lumps on her thigh and numbness down the side of her leg and in her foot. Buttrey's insurer refused to extend her temporary total disability benefits, however, and after a hearing in July 1987, the Workers' Compensation Court later denied temporary total disability benefits on the grounds that her leg injury had reached maximum healing on March 18, 1987.

On June 4, 1987, Weaver's injured leg "gave out" while she was climbing a bleacher at a Little League game. She fell, injuring her left knee and reinjuring her left thigh. Dr. Bloemendaal saw her two weeks later. In his July 1989 deposition, he testified

3

that she would not have fallen "if she had had a good strong quadriceps" and that even after the June 4 accident she still should be able to work if she kept that muscle "in tone and function." Weaver continued to experience pain, weakness, and numbness in her leg, and at the time of trial in December 1991 she still limped, found it difficult to drive a car, and had curtailed her homemaking and recreational activities.

In August 1988, Weaver petitioned the Workers' Compensation Court for a determination of permanent partial disability benefits under § 39-71-703, MCA (1985). At the hearing in November 1988, the former manager of the Cut Bank Buttrey store testified that Weaver had worked for him for nearly ten years, that she was an "excellent employee," and that he would rehire her if she had a release to return to work and he had a position available. Weaver's vocational rehabilitation counselor testified that Weaver would be physically capable of half-time work as a checker. The court found that Weaver was permanently partially disabled but held that "measurement of her post-injury earning capacity is impossible because of [Weaver's] failure to introduce evidence necessary for such determination."

Weaver interpreted the court's order as a request for additional proof of disability. Accordingly, she consulted Dr. Lawrence Iwersen of the Kalispell Orthopedic Clinic in May 1989, without seeking approval from Buttrey's insurer. Dr. Iwersen recommended "nerve testing" and referred her to Dr. John Stephens, a rehabilitation specialist in Kalispell. Dr. Stephens saw Weaver

4

twice in June 1989, without approval from Buttrey's insurer. He ordered magnetic resonance imaging (MRI), which showed a "moderate disk bulge" in her lower back, and conducted an electromyograph study (EMG), which showed no evidence of radiculopathy, or nerve root damage. Despite the negative EMG results, Dr. Stephens wrote in his notes for June 13, 1989 that "it is certainly possible that her work-related injury resulted in the back problem as well as it is possible that the alteration in her gait has aggravated this."

Dr. Stephens referred Weaver to Dr. James Mahnke, a Kalispell neurologist. Dr. Mahnke performed a complete examination in August 1989 and diagnosed a "structural disease of the lower spine," which "may respond only to surgery." Weaver learned of this diagnosis for the first time when she saw Dr. Stephens again in May 1990. In his notes for that consultation, Dr. Stephens stated that Weaver needed further evaluation and treatment, adding, "I would feel on a more probable than not basis that her problem is related to her work-related injury."

In August 1990, Dr. Stephens referred Weaver to another neurologist, Dr. Stephanie Herder in Great Falls. Dr. Herder recommended nerve conduction studies and another EMG, "in order to definitively rule out or rule in surgery." Dr. Stephens did repeat the EMG in January 1991 and again found no clear evidence of radiculopathy.

In the meantime, Weaver was working at the tavern that she and her husband had bought in 1985. By 1988 she had taken over the bookkeeping function, replacing a part time employee who had been

5

paid $6.50 an hour. This work occupied Weaver for three hours each weekday morning. During the summer of 1988, she began to assume afternoon and evening bartending duties as well. The bar was equipped with a stool at each end so that she could sit down when not waiting on customers. By 1989 Weaver had taken over the duties of three part-time bartenders, and by the time of the trial in December 1991, she and her husband were doing all the work required to run the business, seven days a week.

In September 1991, the Weavers sold the tavern to Weaver's sister and her husband. At her deposition in October 1991, Weaver said that the "anticipated arrangement" for running the tavern would include herself and her husband, "mainly to give us a way to earn a living until things [her Workers' Compensation claim] are resolved." At the time of the trial in December 1991, Weaver and her husband were paying themselves, as they had in the past, by "taking cash out of the bar."

Weaver petitioned the Workers' Compensation Court for the third time in May 1991, seeking reinstatement of her temporary total disability benefits retroactively and prospectively, as well as medical benefits, costs and attorney's fees. The basis of her claim was her lower back condition, which had not been reported as an injury at the time of her accident at the Buttrey store in 1986 and therefore had not been considered when her benefits were terminated on April 4, 1987.

The court held that although Weaver was not entitled to temporary total disability benefits, Buttrey's insurer was

6

responsible for the medical expenses related to her "low back pain" because Dr. Stephens had related the back pain to the June 15, 1986 injury. The court found that "a preponderance of the medical evidence" supported the conclusion that Weaver's lower back injury was caused by the June 15, 1986 accident or by the change in her gait due to her left leg pain. The insurer was held liable only for future medical bills for Weaver's lower back condition, however, because Weaver had not obtained its approval for the examinations performed by Drs. Iwersen, Stephens, Mahnke, and Herder. The court also found that because Buttrey had not unreasonably refused payment of disability benefits, Weaver was not entitled to the 20 percent penalty authorized by § 39-71-2907, MCA (1985). Weaver was awarded costs and attorney's fees on the issue of medical benefits only.

The issues on appeal are:

(1) Did the Workers' Compensation Court err in finding that Weaver's back condition was caused by her 1986 work injury?

(2) Did the Workers' Compensation Court err in refusing to reinstate Weaver's temporary total disability benefits for injuries sustained at the Buttrey store on June 15, 1986?

(3) Did the Workers' Compensation Court err in denying Weaver medical benefits for the diagnostic work done on her lower back during the 1989-91 period?

(4) Is Weaver entitled to a penalty for unreasonably withheld temporary total disability and medical benefits?

(5) Is Weaver entitled to reasonable costs and attorney's

7

fees for the disability issue as well as for the medical benefits issue?

I

The first issue is whether the Worker's Compensation Court erred in finding that Weaver's lower back injury was caused by her accident at the Buttrey store in June 1986. We will not substitute our judgment for that of the Workers' Compensation Court when substantial, credible evidence supports the court's conclusion, as it does here. McIntyre v. Glen Lake Irrigation Dist. (1991), 813 P.2d 451, 455, 48 St.Rep. 579, 581; Anderson v. Hammer (1992), 826 P.2d 931, 934, 49 St.Rep. 165, 167.

The immediate, visible consequences of Weaver's accident had to do with her left leg. Because she told the physicians who examined her during the next several months that her leg hurt, they focussed exclusively on the leg. Not until May 1989, after Weaver had experienced pain and weakness in her leg for three years, did a doctor suspect that she might have a back problem. The medical evidence accumulated since then establishes that she has a damaged disc in her lower spine but does not establish what caused this injury. It may have been a pre-existing condition that was aggravated by the accident itself or by the fact that the pain in her left leg caused her to limp. Whether it was caused or merely aggravated by the accident, however, it is a compensable disability. Belton v. Carlson Transport (1983), 202 Mont. 384, 386, 658 P.2d 405, 407 ("An accident is comepnsable if the traumatic event or unusual strain aggravates a pre-existing

8

injury."). See Jones v. St. Regis Paper Co. (1981), 196 Mont. 138, 639 P.2d 1140 (claimant injured his back while working as a logger in 1976 but was entitled to benefits for subsequent disability caused by bending and lifting activities in his work as a lumber grader). We hold that substantial, credible evidence supports the Worker's Compensation Court's award of medical benefits for Weaver's lower back condition.

## II

Given that Weaver's back injury is compensable, the second question is whether she is entitled to temporary total disability benefits for that injury. To be entitled to temporary total disability benefits, a claimant must meet the requirements of § 39-71-116(19), MCA (1985), which defines temporary total disability as:

> a condition resulting from an injury as defined in this chapter that results in total loss of wages and exists until the injured worker is as far restored as the permanent character of the injuries will permit.

To demonstrate "total loss of wages," a claimant must establish what jobs constitute her normal labor market and prove complete inability to perform the duties associated with those jobs. Metzger v. Chemetron Corp. (1984), 212 Mont. 351, 355, 687 P.2d 1033, 1035. Here, Weaver failed to meet her burden of proving a complete inability to perform the jobs within her normal labor market. She had been working for at least three years as a bookkeeper and bartender, and she had applied for a job as checker in the new Cut Bank Buttrey store. At the trial in December 1991, she stated that she thought she could work as a checker and would

9

"give it a good try," but that she was waiting for a resolution of her Workers' Compensation claim before applying at the new Cut Bank IGA store. As the Workers' Compensation hearing examiner put it, "[t]he evidence of her ability to work is overwhelming."

Weaver asserts that she has not been "gainfully employed" since her temporary benefits were terminated in March 1987. She is paid no money as a direct wage for her work at the tavern, she says, and receives no benefits. This Court, however, has adopted the "economic gain" standard for determining eligibility for total disability benefits. Anderson v. Hammer (1992), 826 P.2d 931, 936, 49 St.Rep. 165, 168. Under the Workers' Compensation Act, "wages" simply means gross earnings, or "anything of value received as consideration for work . . . constituting real economic gain to the employee." Scyphers v. H & H Lumber (1989), 237 Mont. 424, 426, 774 P.2d 393, 394.

Here, Weaver and her husband took a "draw" on the tavern income to meet their living expenses. Weaver's contribution to the effort that generated this income was at least equal to her husband's. In her October 1991 deposition, for example, she stated that she worked in the bar "three or four nights a week" in addition to her daily bookkeeping duties, and that "I can't handle it by myself, but my husband is not a bookkeeper and he's not a bartender. He don't like it and he's not good." Whether Weaver's share of the tavern receipts is described as a "draw" or "wages," it has covered her living expenses for at least four years. Indubitably, it is "real economic gain."

10

The Workers' Compensation Court also based its denial of temporary total disability benefits on its previous finding that Weaver had reached maximum healing with respect to her leg injury. That finding was based on Dr. Bloemendaal's "release" of March 18, 1987. Weaver argues that Dr. Bloemendaal's opinion referred only to her leg injury, that further evaluation and treatment was needed for the back injury that was discovered in 1989, and that she therefore has not reached maximum healing and is entitled to temporary total disability benefits. We do not address this issue because we hold that Weaver's earnings from the tavern alone disqualified her for those benefits.

### III

Next, we must decide whether Weaver is entitled to medical benefits for the diagnostic work done on her back during the 1989-91 period. The Workers' Compensation Court found that Buttrey's insurer is not responsible for Weaver's medical expenses during this period because Weaver neither requested nor obtained authorization from the insurer for her visits to Drs. Iwersen, Stephens, Mahnke and Herder. Rule 24.29.1403, ARM, requires authorization from the insurer for changing a worker's treating physician or referring a worker to a medical specialist. Carroll v. Wells Fargo Armored Service Corp. (1989), 240 Mont. 151, 783 P.2d 387.

Weaver argues that under Rule 24.29.1403 the injured worker selects the initial treating physician; that Drs. Iwersen and Stephens were the "initial treating physicians for her back

11

injury;" and that under § 39-71-704(1), MCA (1985), Buttrey's insurer is required to pay for reasonable services provided by those doctors. Further, Weaver argues, because Drs. Mahnke and Herder were neurological consultants for Dr. Stephens, Buttrey's insurer should pay for their services too.

Weaver did not, however, consult Dr. Iwersen about her back problem. Her purpose in calling him was to find support for her Workers' Compensation claim, for which Dr. Bloemendaal was the initial treating physician. It is undisputed that she did not ask for authorization to consult Dr. Iwersen or Dr. Stephens and that she also did not seek approval for Dr. Stephens' subsequent referrals to other doctors. We hold that the Workers' Compensation Court applied Rule 24.29.1403 correctly in denying medical benefits for the 1989-91 period while awarding future benefits for medical expenses incurred in compliance with the rules.

We distinguish our holding here from our holding in Chapman v. Research Cottrell (1991), 248 Mont. 353, 811 P.2d 1283. In Chapman, the Workers' Compensation Court denied medical benefits to a claimant who had consulted a neurologist without authorization from her employer's insurer. We reversed on the grounds that the doctor designated by the insurer as the initial treating physician was not selected by the claimant and had performed no treatment other than to prescribe medication, while the neurologist was selected by the claimant and was the first doctor to diagnose her injury correctly. Here, Dr. Bloemendaal, who was considered by Buttrey's insurer to be Weaver's initial treating physician,

12

treated Weaver's leg extensively from October 1986 through June 1987. His letter of March 18, 1987 was regarded by both Weaver and the insurer as a "release" indicating that her leg was healed enough for her to return to work. Moreover, Weaver waited nearly two years after her last visit to Dr. Bloemendaal to consult Dr. Iwersen, while the claimant in Chapman consulted the neurologist within a month after her accident. We held, therefore, that the Chapman claimant had only one initial treating physician, for whom the insurer's authorization was not required. Here, Weaver changed her treating physician, which does require authorization.

IV

Next, we consider whether Weaver is entitled to a penalty for unreasonably withheld benefits. Section 39-71-2907, MCA (1985), provides that the Workers' Compensation Court may increase a claimant's benefit by 20 percent if it finds that payment of compensation has been unreasonably delayed or refused by an insurer. Unreasonableness is a question of fact, and we will not overturn the trial court's finding if it is supported by substantial evidence. Milender v. Carpenter (1987), 230 Mont. 1, 6, 748 P.2d 932, 935.

Here, Weaver argues that Buttrey's insurer unreasonably withheld payment of disability and medical benefits for her back injury. We disagree. Since it was not self-evident that this injury was caused by Weaver's accident at Buttrey's in June 1986, and since the medical evidence linking the injury to the accident was submitted at least three years after the accident occurred and

13

was somewhat equivocal, denial of the claim was not unreasonable. We hold, therefore, that substantial credible evidence supports the Workers' Compensation Court's denial of the 20 percent penalty.

V

Finally, we address the issue of costs and attorney's fees. Under § 39-71-611, MCA (1985), an insurer who denies liability for a claim that is later adjudged compensable by the Workers' Compensation Court is liable for reasonable costs and attorney's fees. Here, Buttrey's insurer has consistently denied liability for Weaver's back injury, which the Worker's Compensation Court and now this Court have adjudged compensable. Weaver argues that she therefore is entitled to all costs and attorney's fees incurred in connection with this claim for a back injury. The court awarded costs and attorney's fees for litigating the issue of medical benefits only.

We held in Buckman v. Montana Deaconess Hospital (1989), 238 Mont. 516, 521, 776 P.2d 1210, 1213, that attorney's fees should not be awarded for issues on which the claimant did not prevail, for the same reason that an attorney would not receive attorney fees in a case where he did not prevail on any issue. Here, Weaver is not entitled to attorney's fees and costs associated with the issue of disability benefits because the Workers' Compensation Court found that she is not entitled to disability benefits at this time. Although, as the court pointed out, Weaver might be entitled to permanent partial disability benefits if she were to apply for them, she is not entitled to attorney's fees on this issue now. At

14

present, the court has found only the medical benefits to be payable. Therefore, Weaver is entitled to costs and attorney's fees only for that claim.

Affirmed on all issues.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

15



ED SMITH
CLERK

October 29, 1992

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Richard J. Martin
ALEXANDER, BAUCUS & LINNELL, P.C.
P.O. Box 2629
Great Falls, MT 59403

G. Curtis Drake
KELLER, REYNOLDS, DRAKE,
STERNHAGEN & JOHNSON. P.C.
38 South Last Chance Gulch
Helena, MT 59601

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
    Deputy